All rise. The North Dakota Court of Interdiction, back in session, on the Justice Robert E. Norton's design. May everyone proceed to their seats. And would the lawyers who would like to argue please approach the bench and introduce yourself to the court. Good morning, Your Honor. May it please the Court, Keith Moskowitz on behalf of Continental Casualty. Good morning, Andrew May on behalf of the Appalachian Northwestern Medical Faculty. How many time do you want for a vote? Three minutes, Your Honor. Okay, that would be fine. Thanks. Excuse me, counsel, would you say your name, please? Keith Moskowitz on behalf of Continental Casualty. Spell that last name. M-O-S-K-O-W-I-T-Z. Thank you. We want you to know Justice Lamkin is on this case and she will listen to the tapes as she is able to. Good morning, Your Honors. May it please the Court again, Keith Moskowitz on behalf of Continental Casualty. Your Honors, there were several critical errors made in the circuit court's order applying the so-called Pepper's Doctrine to state the determination of two exclusions in the Continental insurance policy that's at issue in this case. I'm going to talk significantly about the errors made in connection with the review of professional services exclusion, speak briefly as to the care custody control exclusion, and then time permitting, comment again briefly on the dispute between the parties regarding the appropriate standard of review for this appeal. By way of brief background, the underlying litigation that brings us into this insurance coverage dispute involves approximately 60 plaintiffs who have brought suits against the Northwestern Medical Faculty Foundation and Northwestern Medical Hospital, arising out of agreements that these plaintiffs entered into with the faculty foundation to store semen and testicular tissue samples. The plaintiffs allege that the cryogenic tank that was used to store the samples failed, resulting in thawing of the samples that became unusable. Important for purposes of this appeal, the causes of action that the plaintiffs and those underlying cases proceed on sound in negligence and bailment. Also important to consider in this appeal is to understand the public policy of Illinois with regard to insurance declaratory judgment actions. There's an important policy enunciated in the declaratory judgment action and by the Supreme Court in this case to have courts declare insurance rights as soon as practicable, not only because that benefits the parties to the insurance contract, the policyholder and the insurance company, but significantly because it also informs the underlying claimants in the litigation as to the status of that insurance. With that policy in mind, there's really only one exception that should cause a court not to determine the coverage rights, and that's the so-called Pepper's Doctrine. And that doctrine arises in one of two circumstances where the circuit court concludes that it would have to determine what's known as an ultimate fact. And so why? That is exactly what this court concluded, the lower court, that it would have to determine the ultimate facts in order to give you the relief that you were asking for. So why is Pepper's not applicable there? Certainly. And you are correct, Your Honor, with regard to the holding of the underlying court. The court erred in several ways with regard to both its analysis of Pepper's and its ultimate conclusion. Let me speak first to the professional services exclusion. There is a very narrow issue, factual issue, that the circuit court would need to decide to adjudicate the professional services exclusion. The professional services exclusion in the Continental Policy bars coverage, in short, for liability of the faculty foundation that arises out of a professional service. The circuit court correctly noted that the term professional services is not defined in the Continental Policy and then correctly applied the definition that's been adopted by the Illinois courts, which defines a professional service for purposes of the exclusion as a business activity that is predominantly intellectual or mental as opposed to physical or manual. So the first key point here is that what the circuit court needs to decide is that very narrow issue, is the business activity for which the foundation is allegedly liable, intellectual or mental, on the one hand, as opposed to physical or manual. In this regard, the first error that the circuit court made was just providing a conclusory statement in the court's order that making that determination would tend to determine an ultimate fact crucial to the underlying provision. And why would it not? I mean, that's one of the major issues. Yes, Your Honor. The error of professional services. That's correct. What the court doesn't do is provide any explanation to support the basis for that decision. The court does not provide any explanation in the opinion. They do not go through the analysis to show how that determination, is it intellectual or mental as opposed to physical or manual, would have stopped the plaintiffs from pursuing their negligence and bailment claims in the underlying case. There's no analysis of that. Nor is there any analysis. Would it not have made that ultimate fact determination if it had addressed that issue? Not at all, Your Honor. Had the circuit court gone through that analysis, they would have concluded negative for these reasons. First, with regard to the plaintiff's negligence claims, a determination as to whether or not the faculty foundation's business activities were mental or intellectual as opposed to physical or manual has no bearing on a cause of action sounding in negligence. It would not decide any issue that would have stopped plaintiffs in the underlying case from pursuing that theory. Similarly, with regard to the elements of a bailment cause of action, which is the other claim in the underlying case, again, whether the liability was arising out of business activity that was mental or intellectual or physical or manual has absolutely no relevance to a plaintiff's bailment claim. It certainly wouldn't rise to the level of a stopper. The second error on the Court's part is looking at the ultimate liability of the faculty foundation. It has no relevance. Why do you want to decide it now? Your Honor, we want the issue decided now for two reasons. First and foremost, to comport with Illinois' strong public policy of having insurance rights of the parties determined as early as possible in litigation. We have over 60 underlying cases. While the cases are consolidated for purposes, it's not a class action. These are individual actions. And it benefits not only the parties to the insurance agreement at issue, but it benefits all of those underlying plaintiffs to understand whether or not this insurance policy, an asset of the faculty foundation, is or is not going to be a potential source of payment for those claims. That is the strong Illinois public policy. And that's the public policy, respectfully, that should be enforced here, again, unless there's a pepper showing, which is shown in our briefing and as I was articulating, simply cannot be met and the Circuit Court didn't meet it in this case. If Your Honor then looks at the second piece of the analysis on professional service, I talked about estoppel. Conversely, as I mentioned, there is no showing by the Circuit Court that making that narrow factual determination would in any way impair the ability of the faculty foundation to defend against the negligence claims or the bailout claims. So are you saying that the court could make a determination of negligence or bailment here? The coverage court and the declared court of judgment actually does not have to make that determination at all. To determine whether the exclusion applies, the court needs to make one narrow factual finding. What would that be? Was the business activity of the faculty foundation that allegedly gives rise to the bailment and negligence claims in the underlying cases a business activity that was predominantly mental or intellectual as opposed to physical or manual? If the Circuit Court makes that narrow determination, they resolve the question as to the applicability of the exclusion. One way or the other. Obviously, they could decide it against my client. They could decide it for my client. That determination has absolutely no bearing on the negligence and bailment claims in the underlying cases. And indeed, there is no opportunity even for the Circuit Court to make a determination of liability to address those factual findings. It has nothing to do with the liability of the faculty foundation or alleged liability of the faculty foundation in the underlying case. Indeed, Your Honors can see this from looking at the additional error we would point out with regard to the Circuit Court order as it pertains to the additional comment the Circuit Court made about having to make, this going to Your Honors' question, a finding of malpractice liability. So the court goes on in its order to provide an additional basis, and it says that to adjudicate the professional services exclusion, it would have to find whether the faculty foundation committed what the court called health care malpractice. Here, you have a machine here. The machine is plugged into the wall. And it keeps these things basically in a frozen condition. Correct? Correct. So a cleaning lady comes in at night, and she has her vacuum cleaner with her. She doesn't speak any English and doesn't understand what that machine is, and she needs to plug in her vacuum cleaner. So she pulls out this thing. I don't know that it happened that way. And she's vacuuming, and the product loses its viability. In doing that, in getting that type of testimony, aren't you deciding negligent issues? So isn't the court correct to do that later? Your Honor, respectfully, no. First and foremost, those are not the facts of this particular case, but assuming the hypothetical is that nature. Yeah, I did it as a hypothetical. Absolutely. So assuming that hypothetical, what the court would be looking at there, let's say the court concluded that was physical or manual. That hypothetical lends itself to a finding of a physical or manual activity. The question then in the underlying case would be, is that physical or manual operation, was it done with due care? That's the fundamental question. The declaratory judgment court does not reach the question of whether the physical or manual, and, Your Honor, it's hypothetical activity, was done with due care. It may have been done with due care. It may not have been the cause of the loss, right, the elements of a negligence claim. None of those elements of a negligence claim are determined in any way by a finding that the activity that Your Honor gives in the hypothetical was physical or manual, as opposed to mental or intellectual. And I respectfully suggest that. But you're making a determination based on evidence as to what happened. And that seems to be where the problem is, because it interrelates to the underlying case. That's the problem that you have. And I would argue respectfully, Your Honor, that when you look at the Peppers decision, and you particularly juxtapose it against the strong public policy of determining the coverage issues, what Peppers looks at is a very high, very high standard. In the case of the plaintiff's claims, it speaks of estoppel, a legal estoppel for the plaintiff's ability to pursue their theories. In the case of the liability defense of the insurer, it talks about an issue crucial. The language the court uses is a crucial issue to the determination of that liability. So arguably, Your Honor, even within the confines of Peppers, if the coverage court was to have to declare an issue that was of ancillary interest to the ultimate determination of negligence, that would not rise to the standard enunciated in Peppers, which is a crucial issue. And I would respectfully submit, Your Honor, the way to look at a crucial issue is to look at the elements of the cause of action. And there is no finding that would be supported as to negligence in terms of breach of the duty, causation, damages, by a conclusion that in your hypothetical, a manual activity of unplugging the machine was the cause of the loss. And I'm mindful of my time, Your Honor, so I'll make two brief points with regard to the care, custody, and control exclusion and then take any questions from the court and otherwise wait for my rebuttal. With regard to the care, custody, and control exclusion, again, there are two issues here that don't satisfy the Peppers standard. The first goes to the question of estoppel that we talked about a moment ago. To adjudicate the care, custody, and control exclusion, the key factual issue, and the parties agree on this, is the question of exclusive possession. Did the faculty foundation have exclusive possession of the samples at the time of the loss? Now, the first error the circuit court made was that it didn't appreciate the distinction in timing between the satisfaction for possession purposes of the samples under the exclusion versus the bailment cause of action in the underlying cases. To establish a legal bailment under Eleanor law, the timing of possession is the timing of the creation of the bailment. To establish the care, custody, and control exclusion, the timing is the timing of the loss. Therefore, we will not have an estoppel situation arise because the only determination being made is whether the faculty foundation had possession at the time of the loss, not at the time of the creation of the bailment. The second point here is that the circuit court error and the faculty foundation errors in pressing the notion that exclusive possession in the jurisprudence that explains the care, custody, and control exclusion means all or nothing possession. So, in essence, the argument made by the faculty foundation and, respectfully, the circuit court's order, which effectively adopts, is that a finding of exclusive possession means possession of the faculty foundation at the expense as to any other entity's possession, specifically here at the hospital, which is the key issue. But that's not the law. The law in Illinois, including as enunciated by this Coordination versus Home Indemnity Court, is that exclusivity is not literal exclusivity. All it requires is that the insured had something more than temporary access or limited possession. So what we're talking about here is an adjudication of facts to determine the exclusion that turns on a level of possession and not literal exclusivity. Therefore, the determination could be made by the circuit court as to a finding of a level of possession that satisfies the care, custody, and control exclusion, but that would in no way preclude either the plaintiffs in the underlying case from pursuing their negligence theories based on a different level of possession on the part of the hospital, nor would it preclude the faculty foundation to the extent that it's asserting negligence claims against third parties from establishing those claims based on, again, a level of possession. So those are the key points with regard to the care, custody, and control exclusion. Finally, Your Honors, to conclude, as we lay out the briefing, and I'll rest on the briefing principally on this point, we have argued that there is a de novo standard of review applicable here. The faculty foundation has argued in favor of abuse of discretion. We would respectfully suggest, again, according to, pursuant to the language in our briefs, that it's de novo, that in any event, as we point out in the briefs, we believe here that the errors by the trial court are so significant that they would satisfy either standard. Thank you. May it please the Court. Andrew Mann, on behalf of the Applee Northwestern Medical Faculty Foundation. I'd like to start with the professional services exclusion, since that's what Continental spent the bulk of its argument focusing on. And, Justice Gordon, I think you hit it right on the head, which is that Continental wants to look at this very narrowly. They want to say that the only issue to be decided is whether the business activity here involved is predominantly mental or an intellectual or physical or manual. But you can't decide that in a vacuum. How is the trial court going to make that determination? It's going to have to look at the evidence of what services NMFF was actually providing in this instance. It's going to have to look at who was involved in monitoring the tank. Were they qualified? What was their educational background? Did NMFF provide them training? Was the training adequate? How often did they monitor the tank? What procedures were in place? Did they follow those procedures? Those are all the critical questions that when the trial court is considering them and making rulings on those issues, it is invading the privacy of the trial court. It is stepping on the toes of the trial court. And that's exactly what the Pepper's Doctrine was intended to do. The issue of what services NMFF was providing is part and parcel of the underlying case. That is what the underlying cases are all about. And the parties have spent hours and hours of time in depositions and conducting discovery trying to get to the bottom of that issue. So if the coverage court takes that issue up now, it's going to be invading the promise of the trial court and the lower court correctly recognized that the Pepper's Doctrine was intended to prevent that. But there's another point here that I'd like to make. Counsel, why cannot your opponent rely on the John Anonymous case? And why is it that as a result of the discovery responses made by the foundation, that there isn't already on the record a concession that the foundation exercised exclusive possession? So you're talking about the care custody or control exclusion. Firstly, just sort of a procedure point, the John Anonymous case has been settled. That case is no longer ongoing. But what NMFF actually admitted in that case, if you look at the allegations, the allegations allege that NMFF owned, operated, managed, and controlled the tank. What NMFF admitted is that it owned and operated the tank. It denied that it had control. So there was no admission that NMFF had control. Because in fact, from NMFF's perspective, we've asserted third-party complaints against the third-party entities that manufactured the tank and its component parts, saying that they're the ones that exercised control over the tank. They're the ones that created the cryogenic environment in which these samples lived. And without that cryogenic environment, there would be no way for them to survive. So far from admitting that NMFF had control, NMFF denied it. And that is fully reflected by the third-party complaints as well. And I'm happy to say, if the Court would like me to spend some time on the care, custody, or control exclusion, I'm happy to spend some more time on that. I just wanted to make one quick point on the professional services exclusion and then turn back to the care, custody, or control exclusion, which is this. If you look at the language of the professional services in the continental policy, what it precludes is a loss that arises out of the rendering of professional services by NMFF. That in and of itself, regardless of whether the services are professional or not, a finding that NMFF rendered services that contributed to the loss connects NMFF to the liability in a way that would preclude it from arguing otherwise in the underlying cases. If the Court says this loss arises out of services NMFF, you rendered, that is completely antithetical to NMFF's position in the underlying cases, which is that this is an equipment failure case. We had a refrigerator, essentially, that was supposed to keep these samples at really, really cold temperatures, and all of a sudden that refrigerator failed one day and the samples thawed. From our position, that doesn't arise out of services we rendered. It's an equipment failure case. The loss arises out of the negligence of the third-party manufacturers. They're the ones whose negligent design and negligent manufacture caused this thing to fail. So putting aside whether the services are professional or not, connecting the loss to services NMFF rendered is problematic in its own right. With respect to the care custodial control exclusion, the key issue is whether NMFF exercised exclusive care custodial control. The cases are clear on this. It has to be that NMFF had exclusive control at the time of the loss. Looking beyond the allegations, because there's no way to determine this on the allegations, the allegations assert identical counts against both NMFF and its co-defendant, Northwestern Memorial Hospital, saying that each of those entities controlled the samples. If you look beyond the allegations, that's going to be problematic for two reasons. One, it's going to impact the underlying plaintiff's claims against NMH. The allegations against NMH, just like the allegations against NMFF, are that NMFF was negligent by failing to adequately maintain the samples, adequately store the samples, adequately preserve the samples, adequately monitor the tank. All of those issues, control is key to there. How can you say that NMH negligently maintained the samples if it had no control over the samples at the time of loss? That would thwart the underlying plaintiff's ability to pursue their claims against NMH. It would also, as I alluded to a moment ago, it would also. . . The claim that they were damaged is not necessary for either the bailment issue or the negligence claim. I heard counsel make that point today. That's not what they said in their brief, and that's not respectfully what the cases said. The cases are pretty clear. They have said it earlier. That you have to have. . . What? They've said it earlier than. . . We have no tally to that. What is your response to that? The case law, as I understand it, Your Honor, it is. . . They made earlier than their argument this morning. They have made that argument. Yes, and in responding to that point, Your Honor, if you look at the cases that have analyzed the care custody or control exclusion, they speak to the issue of exclusive care custody or control. The control has to be. . . And a great example of that is the Starks Brothers case, which is one of the cases that we cited. It's a Northern District of Illinois case. It's Judge Aspin applying Illinois law. But you have a situation there where you had, just like here, you had identical bailment counts asserted against two co-defendants, asserting that each one of them had control over the property. And the court there. . . You cannot decide. . . I cannot decide whether one party, whether the care custody or control exclusion applies because there has to be exclusive care custody or control over the property at the time of loss. It can be interrupted. You can have somebody that has intermittent access to it, but the control. . . The key issue is control. The control needs to be exclusive. I thought the key issue was exclusive, and they seem to say exclusive is not exclusive. Sure. It is a refined distinction. As I view the cases, Justice Hall, what they're talking about is that, for example, if the insured had intermittent access to it for whatever reason, or somebody else. . . An example was there was the Liberty case where the property was kept in a hotel room, and the insured was the hotel, and the hotel occupants had access to the property intermittently. The court said there, that's okay, we're still going to apply the care custody or control because the entire time the security arrangements were controlled by the hotel. The hotel at all times had control, even though access to the property was at times intermittent and interrupted by the guests in the hotel. So there can be other people who have temporary access, but if the control is not exclusive, then the exclusion doesn't apply. And here, we think that not only do the allegations in the complaint allege that both NMFF and NMH have control of the samples, but considering the third-party complaints, if the court goes down that road and it starts saying, NMFF, you are the only one in control here, that's going to be something where in the underlying cases, that's going to come back to bite NMFF because now we've had all the underlying plaintiffs that are joined as parties in this case. We've got NMFF as a party. That's going to collaterally stop the parties from relitigating that issue in the trial court, which is where it should be litigated in the first instance. But the last point that I want to make, I do want to make a quick point about the standard of review, which is an issue that was briefed in the briefing on this. Because this is a neurolocatory appeal, the state of the reserve. A public policy issue raised by your opponent. I mean, why is it not in the best interest? We've got all these cases pending, some 60-plus cases. Why couldn't the court have kicked the ball a little further down the road in order toward resolution of these matters? Isn't that in the best interest? Well, candidly, I don't think it's in the best interest. And I think what counsel had mentioned was that the policy is that it should be adjudicated at the earliest possible time. The caveat to that, of course, is the Peppers Doctrine, as acknowledged, which we think applies here. So, yes, of course, if there wasn't a Peppers Doctrine problem, we wouldn't have a problem with adjudicating these cases earlier. But right now, we do. And, by the way, Continental is not defending NMFF in the underlying cases right now. The primary insurer, Century, was the one who was defending us. We settled with Century. So right now, NMFF is on its own. So the notion that there's an urgency to decide these issues right now when Continental isn't even defending NMFF, I think is contrary to what the facts actually are here. But I think the broader point remains, Justice Hall, that that public policy takes a backseat to the Peppers Doctrine when the Peppers Doctrine applies, which we think it does here. With respect to the standard of review, because this is an interlocutory appeal, the underlying cases are still ongoing, arising out of a stay order under Rule 307. We would submit that an abusive discretion standard applies here. And as this Court knows, an abusive discretion standard is the most deferential standard of review that exists. It's what the Supreme Court has characterized as next to no review at all. So the question under an abusive discretion standard is not whether you agree with the lower court. It's whether the lower court acted arbitrarily and exceeded the bounds of reason in its ruling, which I think, quite clearly, the lower court did not. It gave a very thoughtful, reasoned opinion for why it considered the overlapping issues between the coverage issue and the underlying cases to be so inextricably intertwined that it wanted to say, I'm going to hold off on deciding these important issues until such time as we can be sure that the parties in the underlying case have had a full and fair opportunity to litigate them and the trial court has had an opportunity to rule upon them. So applying that abusive discretion standard here, we don't need to even get into the merits of a lot of this because the discretion of the lower court was not abused. With that, if there are any further questions, I'd be happy to address them. Otherwise, we'll stand on a brief. Thank you. I'd like to address three points briefly, Your Honors. First, on the last question, Justice Hall, you asked regarding the public policy. Counsel introduced to the court as a justification for avoiding that public policy evidence that is clearly outside the record on appeal. This record on appeal says nothing with regard to the current status of the defense of the Faculty Foundation. Events have transpired in the case. That's simply not in the record at all. What counsel did not address beyond that was the fact that under the circuit court's order, that public policy, that paramount public policy checked only by the Pepper's Doctrine, will be frustrated here severely because under the circuit court's order, no determination could be made on these two critical policy exclusions until all 62 cases, every last one of them, are fully and finally resolved. And it's very important because it picks up on another point, Justice Hall, you asked counsel, with regard to the John Anonymous case. Understand that, while not articulated here at the podium, the basis for the circuit court's opinion was that an adjudication of the exclusions for John Anonymous, a settled case, would create a Pepper's issue with regard to the other 60-plus cases. And that really drives home the point. There's a complete frustration. None of the parties, including all of those underlying plaintiffs, will understand the status of this insurance asset until the last case is fully and finally resolved. Two other points. First, this case is on all fours with this Court's decision in Envirodyne, Fidelity and Casualty v. Envirodyne. Envirodyne involved a professional services exclusion. This Court went through the Pepper's analysis and concluded that determining whether the professional services exclusion applied where the underlying claims being litigated, just like in this case, were simple negligence claims, would not work in issue under Pepper's. This case is on all fours. Indeed, the only distinguishing fact between this case and Envirodyne is that in this case, not only do we have negligence claims, but we have bailment claims. However, as Continental has explained in its briefs and I've outlined today, in no way does a determination of whether the business activities of the Faculty Foundation were predominantly mental or intellectual as opposed to physical or manual have any bearing on the bailment claim. So in that regard, this case is on all fours. Finally, with regard to the standard of review, the Faculty Foundation cites this Court to TIG v. Canal. All TIG v. Canal decision of this Court concludes is that when a trial court is making a decision to grant or deny a stay, there is the application of the abuse of discretion standard to the appellate court. However, the subsequent cases out of this Court, exemplified by Bove v. Sears-Roba, demonstrate a refined statement of the standard of review. So Bove and his progeny stand for the proposition that a court looks to whether the findings below were findings of law or findings in fact. Fundamentally here, we have a finding of law in its quintessential application. We have a trial court that looked at whether or not it could actually make findings of fact, and it concluded as a matter of law, albeit we argue erroneously under the Pepper's Doctrine, that it could not even make findings of fact. It made purely a finding of law under the Pepper's Doctrine, and therefore there's appeal. Are you saying that In re Lawrence M is not the law anymore? In re Lawrence M is not that law. The issue is this is a refinement, as this Court has articulated in Bove, Coe, and Fuqua, the three cases, three arbitration cases we presented the Court with, in that in those decisions which postdate Lawrence M, what the courts do is they say not that Lawrence M is bad law, but simply that the Court should look to whether or not what is being appealed was an order that represents a finding on the law versus a finding on the fact. So I don't think that those decisions disturb Lawrence M. I think they simply, this Court, in those decisions has simply called for a more careful examination with regard to what was actually decided by the trial court. Thank you, Your Honors. I want to thank the lawyers for a very interesting argument, very well-written briefs, and a very interesting case, and we'll take it under advisement. Thank you, Court will be adjourned.